[Crim. No. 2022. In Bank.—October 13, 1916.]

## THE PEOPLE, Respondent, v. JOSEPH VANCE WILT, Appellant.

CRIMINAL LAW—MURDER IN FIRST DEGREE—EVIDENCE.—The evidence in this prosecution for murder is held sufficient to warrant the jury in being satisfied beyond all reasonable doubt that the defendant was guilty of murder in the first degree.

ID.—EVIDENCE — THREATS AGAINST COMPANION OF DECEASED.—In a prosecution for murder evidence is admissible of threats made by the defendant against a person other than the deceased, where such other person was in the company of the deceased at the time of the killing, and the defendant's assault was directed against him as well as against the deceased.

ID.—INSTRUCTION—ABSTRACT PRINCIPLE—MITIGATION, EXCUSE AND JUSTIFICATION.—In such a prosecution, where the defendant denied the killing and there was no attempt made to justify, excuse, or mitigate it, an instruction correctly stating the abstract principles of the law governing mitigation, excuse, and justification, although inapplicable, is without prejudice.

ID.—CIRCUMSTANTIAL EVIDENCE—REASONABLE DOUBT.—Where the court in its instructions had correctly defined circumstantial evidence, and had fully and correctly charged the jury on the subject of reasonable doubt and as to the necessity of being satisfied beyond all reasonable doubt of all the facts essential to warrant a conviction of murder in any degree, it was proper to give a further instruction in regard to circumstantial evidence declaring that "It is not necessary that every fact and circumstance given in evidence should be proven beyond a reasonable doubt, but only that every fact and circumstance necessary to the conclusion of guilt should be so established. . . . It is for you to decide whether or not any particular fact or circumstance is a necessary link in the chain of evidence; and if you decide that such fact or circumstance is a necessary link then it must be proven to your satisfaction beyond a reasonable doubt."

ID.—DUTY OF JURORS—CONSULTING AND AGREEING ON VERDICT.—An instruction as to the duty of the jurors in the matter of consulting and agreeing upon a verdict, expressly telling them that if any juror entertained a reasonable doubt of the defendant's guilt he should vote to acquit, and should continue to so vote "until convinced" to the contrary, cannot be construed as meaning that a juror may properly change his vote from not guilty to guilty in deference to the views of fellow-jurors, when not satisfied beyond all reasonable doubt of such guilt.

APPEAL from a judgment of the Superior Court of Glenn County, and from an order refusing a new trial. William M. Finch, Judge.

The facts are stated in the opinion of the court.

Arthur C. Huston, and W. T. Belieu, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

ANGELLOTTI, C. J.—Defendant having been indicted for the crime of murder in the unlawful killing of one Warner C. Smith, was convicted of murder in the first degree, and adjudged to suffer death. He appeals from the judgment and from an order denying his motion for a new trial.

1. It is asserted and most earnestly argued by learned counsel for appellant that a careful consideration of the facts "will convince any fair-minded man that there is at least a reasonable doubt as to the guilt of the defendant." The jury by their verdict, and the judge of the trial court by his order denying defendant's motion for a new trial, have said otherwise. We have given the report of the evidence contained in the record our most careful consideration, as, indeed, we do in every capital case where there is the slightest intimation that there is doubt as to the correctness of the verdict. The result of our examination is that we are not only satisfied that the evidence was such that we cannot say that it did not warrant the jury in being satisfied beyond all reasonable doubt as to the guilt of the defendant, but also that the record gives us no reason to doubt the correctness of the verdict. Any possible doubt as to the presence of the defendant at the scene of the homicide is removed by his own testimony given at the trial, from which it appears that he, Jansen (the principal witness for the people), and deceased were the only persons present. That either he or Jansen killed deceased when all three were together is one of the admitted facts of the case. His story told on the witness-stand practically a month after the event is to the effect that Jansen, after an altercation with deceased, drew a revolver and fired several shots at him, and that deceased fell to the ground and Jansen ran away, leaving him (defendant) alone with the deceased. This testimony on the part of defendant was apparently the

first intimation on his part that Jansen was the guilty party. Although arrested on the day and within a few hours of the homicide, and charged with the offense, neither protestation nor claim of innocence, nor any intimation that Jansen did the shooting was forthcoming until he gave his testimony on the trial. All that he appears to have said prior to this in regard to the shooting, so far as we have found, is contained in the report of his recross-examination relative to a conversation between himself and the district attorney a few hours after the homicide, as follows:

"Q. (By District Attorney) : Then didn't you say, in the presence of Mr. Bailey (the sheriff), after I had made those statements to you, didn't you then say to me, after I said to you that it was not Jansen you killed, that it was Smith, and weren't you surprised and said 'I thought it was Jansen.'

"A. I said I was told that it was Jansen, and I turned to Bailey and accused him of saying that.

"Q. Didn't you say to me, 'I thought it was Jansen who was killed.'

"A. I didn't say I thought that, no, I turned to Bailey, and I might have said those words perhaps, but what I meant was I had heard him say it. Everybody was saying it out there. . . .

"Q. You had heard what?

"A. That it was Jansen.

"Q. But, Mr. Wilt, you knew it was Smith, didn't you, that was killed? You knew Jansen killed him; you saw it; you knew all about it.

"A. Yes, I knew all about it.

"Q. Then what did you say that for?

"A. I don't know, I didn't say it with any ulterior motive at all."

Except for the testimony of the defendant, there was no shred of testimony tending in the slightest degree to inculpate Jansen as the perpetrator of this murder, and his testimony was, in view of all the circumstances, of such a nature that, to say the least, it is not surprising that it was rejected by the jury as absolutely unworthy of belief.

The deceased and Jansen were employed in a store in Germantown. Deceased roomed in the home occupied as a residence by Mr. and Mrs. Jansen. Except for the testimony of defendant there was absolutely nothing to indicate

that their relations were not of the most friendly nature. Defendant had been the husband of a sister of Jansen, but she had obtained a divorce some years before, and the minor child of the marriage had been for some years, and was at the time of the homicide, in the custody of the Jansens. Defendant lived in Orland, some miles from Germantown. There certainly had been no great degree of intimacy after the divorce between defendant and the Jansens. Some two years before the homicide there had been some differences between them in relation to defendant visiting the child, and the testimony fairly indicated that defendant had not visited the Jansen house thereafter. There was testimony that about that time he made threats against the Jansens because of this difference. Testimony of Jansen was to the effect that he had seen defendant on very few occasions, and did not know him at all well. According to the testimony of Jansen, he was aroused from his sleep early on the morning of February 14, 1916, about 5:30 o'clock, by the deceased, and on going into the hall found there the deceased and a strange man, some time after declared by him to have been the defendant, whom he did not at once recognize, armed with a revolver. The key of the store having been produced by Jansen, this man marched deceased and Jansen out of the house and to the store, which was opened and entered, and they were then ordered to open the safe. The outer door of the safe was opened, but no key being produced which would open its inner door the attempt of this man to obtain access was abandoned. He marched Jansen and deceased out of the store and down the railroad track away from Germantown for about a mile, and then began firing his revolver at them. Apparently he shot deceased first, killing him. Another shot struck Jansen, inflicting a slight wound, but he, running away, escaped serious injury. He did not at the moment identify in his mind the assailant as Wilt, but a little later, thinking the matter over, became convinced that it was Wilt. The assailant had attempted to disguise himself with a false mustache, and, as already noted, the testimony fairly showed that Jansen had seen very little of Wilt. Such in a general way was Jansen's story, and while it indicated a rather peculiar and, at first blush, a somewhat incomprehensible course of conduct on Wilt's part, it is not at all an impossible story when considered in the light of all the other circum-

stances. Confessedly, Wilt did go that night on his bicycle from Orland to Jansen's house in Germantown, leaving his bicycle under a bridge several hundred feet from the house and walking from the bridge to the house. Confessedly, he then carried the 38-caliber Savage automatic revolver, which was found on him at the time of his arrest, and it sufficiently appears that deceased was killed by a shot from a weapon of this caliber. Confessedly, he fled from the scene of the homicide, and when captured some hours later steadily refused to say a word in reply to the accusation against him, except as we have already indicated, until he gave his testimony at the trial. Any conclusion that his testimony as to his reason for going from Orland to Jansen's home in Germantown was true was unwarranted in view of what the evidence fairly showed as to the relations existing between him and the Jansens. Certainly no such degree of intimacy between Jansen and Wilt appeared as would make it reasonable to suppose that Jansen might desire the counsel or assistance of Wilt in a matter of such a personal nature as that suggested by him. His testimony as to the letter he claimed to have received from Jansen asking him to come, and its contents (such a letter never being produced), and as to his consequent arrival at Jansen's home between 9 and 10 o'clock the night of February 13th, and his conversation with Jansen, and with Jansen and deceased, from that time on until shortly before the homicide, when the three took a walk down the railroad track together, was of such a nature that the jury were fully warranted in rejecting it as false. In addition to its inherent improbability it was absolutely opposed to the testimony given by both Mr. and Mrs. Jansen as to the whereabouts of Jansen during the night of February 13th. We have stated this much for the purpose of showing our reasons for the conclusion that the record is not such as to raise in our minds any doubt as to the correctness of the verdict.

2. Mrs. Masterson, at whose house defendant boarded for a time in January, 1914, and Mrs. Peterich, her daughter, testified as to certain threats then made by him against Jansen. Mrs. Masterson testified substantially that he went out one evening with the avowed purpose of seeing his baby, was away about thirty minutes and came back pale and angry, and said: "Well, it is certainly rough; they have even turned

CLXXIII Cal.—31

my own baby against me," and "Now, to-night, they wouldn't even allow me in the house. I tell you right here, I will get my revenge on that bunch. I will kill that Swandt woman and Jansen. I will get my babies." Mrs. Peterich said substantially that on this occasion defendant said they had refused to let him see his baby and that he would get Jansen and the Swandt woman, that he would kill them, and that about two months later he repeated this threat. Complaint is made that this evidence was improperly admitted, the objection made to Mrs. Masterson's evidence being, according to the record, that it was "incompetent, irrelevant, and immaterial," and no objection apparently having been made to Mrs. Peterich's testimony which was given after Mrs. Masterson had testified. It is earnestly urged that the admission of this evidence was prejudicial error. We are satisfied that as to the claim that the making of these threats was too remote the objection is one that goes to the weight rather than to the admissibility of the evidence. As to the claim that the evidence was not admissible because the threats were not against the deceased, it is unnecessary to discuss the many authorities cited by learned counsel for appellant, in view of the admission by them that a terse and clear statement of the rule applicable is contained in our own case of *People v. Bezy,* 67 Cal. 223, [7 Pac. 643], where it is said: "While threats against the deceased are admissible in evidence to show malice, threats against another person are only admitted under circumstances *which show some connection with the injury inflicted on the deceased.*" (The italics are ours.) Where a sufficient connection is shown such threats are clearly admissible. The evidence of Jansen was to the effect that while Smith alone was killed, the assault was not upon Smith alone, but upon himself *and* Smith, and, according to his testimony, he was wounded by another shot from defendant's pistol. Where A fires shots at B and C, who are together, killing B and wounding C, who nevertheless makes his escape, there being nothing except the mere fact that B was first hit to indicate that the assault was specially directed against him, there would appear to be such a connection between the killing of B and previous threats of A against C as to warrant evidence thereof. Such threats would tend to show a designed assault on the part of A, the primary object of which was the killing of C, and in fact

including B simply because he was with C. If the evidence was that A only the day before the homicide had threatened to kill C on sight, and B (whom A had never before seen) and C while walking together were fired upon by A with the result that B was killed and C wounded, we think no one would question the existence of the connection essential to the admissibility of the evidence as to the threat. There is no difference in principle between such a case and the one before us, so far as the question we are discussing is concerned. We are aware of no decision declaring such evidence inadmissible. There was nothing to indicate that prior to going to Jansen's house during the night preceding the shooting, defendant knew anything about deceased, or even that there was any man living in Jansen's home other than Jansen himself, or that at any time prior to the homicide he ever had any difference whatever with deceased. We are satisfied that in view of all the circumstances, the evidence of threats against Jansen on the part of defendant was properly admitted. As we have said, the remoteness of the threats was a matter going solely to the weight of the evidence.

3. Error is alleged in sustaining an objection to a question asked Jansen on cross-examination, as follows: "How long after the shooting did you go down and have a chat with Mr. Smith, the uncle of this boy, about this tragedy?" The objection was substantially that the same was not proper cross-examination. No statement was made to the court as to the purpose of the question, and apparently nothing had been elicited up to that time to show the pertinency of any such inquiry. It was apparently an isolated and immaterial matter concerning which nothing had been asked Jansen on direct examination, and up to this time it had not been intimated that there was any claim that Jansen himself was the guilty party. We see no good ground for holding that the court erred in sustaining the objection. It is proper to note that it was subsequently fully shown by the testimony of Benjamin Smith, the uncle, that on March 12, 1916, Jansen did come to his house in Maxwell to talk with him about the homicide, in pursuance of a request on his (Jansen's) part that he be permitted to see him made two or three days before.

4. The defendant denied the killing, and there was no attempt to justify, excuse, or mitigate it. The court instructed the jury as follows: "Upon a trial for murder if the commis-

sion of the homicide by the defendant is proved to a moral certainty and beyond a reasonable doubt, then it devolves upon the defendant to prove circumstances of mitigation or that justify or excuse the act, unless the proof on the part of the prosecution tends to show that the crime only amounts to manslaughter, or that the defendant was justifiable or excusable. This does not mean that he must prove such circumstances by a preponderance of the evidence. He is only bound under this rule to produce such evidence as will create in your minds a reasonable doubt as to whether there were circumstances of mitigation, or that justify or excuse the act.'' In so instructing the jury the court was giving a rule declared by section 1105 of the Penal Code. It is claimed that it is error to give such an instruction where the killing is denied. It may be conceded that the instruction was inapplicable, no circumstances of mitigation, excuse, or justification being suggested. (See *People* v. *Tapia,* 131 Cal. 647, 654, [63 Pac. 1001] ; *People* v. *Grill,* 151 Cal. 592, [91 Pac. 515].) But, as said in *People* v. *Tapia,* ''Of course, a judgment will not be reversed for an instruction containing a mere abstract principle because it is not applicable to the case, where it appears that no injury was done.'' In that case an instruction on this subject, where the killing was denied, and the evidence to show that the death of the deceased was due to criminal means used by another person and not by his own act or accident was said to be ''very slight,'' was held prejudicially erroneous, on the ground that the jury may readily have understood the language, ''upon a trial for murder, *the commission of the homicide by the defendant being proved,*'' as intimating an opinion or belief or statement on the part of the trial judge that the homicide *had* been proved. Ordinarily this language could not fairly be held to have any such signification. (See *People* v. *Grill,* 151 Cal. 596, [91 Pac. 515].) But in the case at bar the language of the instruction was ''upon a trial for murder, *if the commission of the homicide by the defendant is proved to a moral certainty and beyond a reasonable doubt,* then'' etc., which entirely obviates the objection suggested in *People* v. *Tapia,* 131 Cal. 647, [63 Pac. 1001]. We can see no possible prejudice to defendant in the giving of this instruction.

5. We can see no reason for concluding that the jury may have been misled by certain instructions given in regard to

circumstantial evidence. Some criticism is made of an instruction declaring: "It is not necessary that every fact and circumstance given in evidence should be proven beyond a reasonable doubt, but only that every fact and circumstance necessary to the conclusion of guilt should be so established. . . . It is for you to decide whether or not any particular fact or circumstance is a necessary link in the chain of evidence; and if you decide that such fact or circumstance is a necessary link then it must be proven to your satisfaction, beyond a reasonable doubt." The latter part of this instruction, concerning which the principal complaint is made, is exactly in accord with what is said in *People* v. *Ah Jake,* 91 Cal. 98, [27 Pac. 595], and as applied to the subject under discussion is unquestionably correct. The learned trial judge had correctly defined circumstantial evidence as testimony "of a chain of circumstances pointing sufficiently strong to the commission of the crime by the defendant," and had further told the jury that whether the evidence was direct or circumstantial "the final test is the same, to wit, does the whole evidence, considered together, satisfy the minds of the jurors beyond a reasonable doubt of the truth of the charge." The language attacked simply told the jury substantially that it was for them to decide whether any particular circumstances concerning which testimony had been given was necessary to complete a chain of circumstances establishing to their satisfaction beyond all reasonable doubt the facts essential to guilt, and that if they decided that it was necessary, it must be proven beyond all reasonable doubt before they could act upon it. In other words, they could not rely upon any circumstance as a link in the chain of circumstances establishing to their satisfaction beyond all reasonable doubt the guilt of the defendant, unless satisfied beyond all reasonable doubt by the proof of the existence of that circumstance; but that it was for them to determine what circumstances were essential *to satisfy their minds* beyond all reasonable doubt of such guilt, and thus constitute necessary links of such chain. This we think must be correct, and we do not understand that any different rule is declared in any California case. It is certainly in accord with what is said in *People* v. *Ah Jake,* 91 Cal. 98, [27 Pac. 595]. We do not think the instruction can fairly be construed, as claimed by appellant, as leaving "to the jury the determination of what was necessary to

constitute the crime." It had reference to an entirely different subject matter, viz., the matter of proof of the facts essential to guilt by circumstantial evidence. As to the facts essential to guilt of murder and the various degrees thereof, the jury were fully and correctly instructed, and they were clearly instructed that they could not convict the defendant of murder in either degree unless satisfied beyond all reasonable doubt of all the facts essential to such a conviction. We do not think it can fairly be assumed that there may have been any misunderstanding as to this. We see no good ground for criticism as to the first portion of the instruction.

6. In our opinion the instruction as to the duty of the jurors in the matter of consulting and agreeing upon a verdict cannot fairly be construed as advising them that a juror may properly change his vote from not guilty to guilty in deference to the the views of fellow-jurors, when not satisfied beyond all reasonable doubt of such guilt. They were expressly told thereby that if any juror entertained a reasonable doubt of the defendant's guilt he should vote to acquit, and should continue to so vote "until convinced" to the contrary. The word "convinced" as here used, and as used in the last sentence of the instruction, "A juror should not hesitate to change his views or opinions of the case *when convinced* that they are erroneous," clearly means "convinced beyond all reasonable doubt," and could not fairly be otherwise understood by the jurors.

7. The evidence was not such as to warrant instructions on manslaughter or the submission to the jury of a "manslaughter verdict." What we have said disposes of all the points made in the briefs. We have fully examined the record and find no other matter requiring notice.

The judgment and order denying a new trial are affirmed.

Shaw, J., Melvin, J., Sloss, J., Lorigan, J., and Lawlor, J., concurred.

Rehearing denied.