[Crim. No. 2474. Second Appellate District, Division Two.—March 14, 1934.]

THE PEOPLE, Respondent, v. HAROLD E. WOLCOTT, Appellant.

Larsen & Shaw, William W. Larsen and Leiland R. Shaw for Appellant.

U. S. Webb, Attorney-General, and James S. Howie, Deputy Attorney-General, for Respondent.

STEPHENS, P. J.—The charging part of the information to which the defendant pleaded not guilty and upon which he was tried before a jury for murder and convicted of manslaughter is as follows: "The said Harold Ernest Wolcott is accused . . . of the crime of murder, a felony, committed as follows: That the said Harold Ernest Wolcott on or about the 13th day of August, 1933, . . . did wilfully, unlawfully and feloniously and with malice aforethought, murder one Helen Bendowski, a human being." After the return of the verdict a motion for new trial was made and denied and sentence was pronounced. Defendant appeals from the order denying the motion for a new trial and from the judgment following the verdict reached by the jury.

Appellant, aged about thirty-three years, and the deceased, Helen Bendowski, aged about thirty years, were very close associates and had been for several years. They had been "keeping company" since 1921. The two had had several serious and violent quarrels. and appellant had intimated that he intended to do the right thing by deceased, when asked why the two did not marry. However, in 1925 he married another, a widow, concealing and denying the marriage to deceased and to others. Later a divorce was secured against appellant. For some time prior to her death deceased kept appellant's rooms in order and generally attended to the domestic duties of the establishment. The conclusion is inescapable that the two were practically living together. Appellant conducted a flower store and lived in rooms constructed mezzanine-like at the back of the store, entering them by a stairway directly from the store. A short stairway also led from the rooms to the flat roof of the building. This roof joined other roofs separated by brick firewalls about two or three feet

high. On the evening of the tragedy the two together attended a dance. A witness testified he saw them at about 9:30, that a little later in the evening the three went to appellant's apartments for drinks and that deceased was in excellent spirits at the time. They returned to the dance at 10:30. There appellant and deceased became separated, but some time thereafter Miss Bendowski, returning to the apartments, according to her statement, was attacked in the alley near the store. One witness testified he heard an outcry and that later, about 2 o'clock A. M., deceased came into his cafe, which adjoined the flower store, and told him about the attack and showed neck scratches and bruises. About 2:45 A. M. appellant was in the witness' cafe, and deceased came in and told appellant about the attack, but appellant expressed doubts about the truth of the story. Later, or at about 4 A. M., the cafe proprietor saw deceased climb a ladder in the rear of his store toward the roof which would lead to the roof entrance to appellant's apartments. She carried several small packages and her hat. These articles were later found on a settee just outside the roof entrance to the apartments. About 5 A. M. appellant awakened deceased's brother-in-law. Appellant was excited and said he had had a fight with deceased and that she had taken his car and gone away.

We now go back and pick up the story as related by a Mr. Miedema, a Pasadena police officer. Miedema was a friend of appellant's and some time after 1 o'clock A. M. went to the latter's apartments and found appellant and deceased there. Deceased was crying and had scratches on her neck. She related the story of the attack but appellant accused her of having improper relations with other men, called her a "damned liar" and raised his arm as though to strike her, but Miedema intervened. Appellant told her that he did not care for her and that she could pack up and leave, to which she replied: "Well, I am glad I found that out. I have lived with you, I have loved you; I have given you everything I have." Miedema left shortly thereafter but returned with a Mrs. Smith at about 5 A. M. Appellant was not there but came shortly afterward, explaining that he had been looking for deceased, who had gone away with his car. He was nervous, angry and

appeared worried over deceased's whereabouts. The three drank some gin mixture and Miedema and Mrs. Smith went downstairs to appellant's living-room. Appellant said he would retire, but in a few minutes Miedema heard appellant's voice upstairs. He talked loudly and angrily. Miedema heard a shot "possibly a minute and a half or two minutes" thereafter, called to appellant and then went upstairs, where appellant told him deceased had shot herself. Miedema went out on the roof but appellant told him to get back, that Miss Bendowski had a gun. The two then went inside and sat down, and appellant cried and mumbled. While the two were seated Miedema heard "a couple more reports", but said they were backfires and did not come from the roof. Appellant insisted that Miedema should remain—that he "must stick by him". Miedema took Mrs. Smith downstairs and let her out of the store, first putting his handkerchief over the lock as he turned it. This incident will be referred to again.

At about 6 o'clock A. M. Dr. Harter and Police Officer Kelly came to the building. Miedema was still with appellant. They found deceased lying on her back, arms outstretched, clothes smoothed out, her coat on but not buttoned. She was dead, having been shot through the chest. A stained bullet was found on the roof. The coat lay back from the right side. The doctor saw throat scratches but no powder marks. Appellant told the officers that he was in the apartment mixing a drink when he heard one shot, and that he ran out and found the girl lying there. Kelly found three .32 caliber revolver shells on the roof, all some distance from the body and across from the fire-wall. The gun found beside deceased was of the kind that the shells would fit it, and was appellant's gun. At this time appellant told the officer that he did not know deceased was on the roof until after the shot. Subsequently he made a statement to officers that as he walked to the sink to mix the drink he saw Miss Bendowski outside, stooping down between the window and door. He assumed to talk to Miedema that deceased would not know he saw her, and presently she made "a large noise on a board outside the window, so I knew that she knew that I knew she was there". She straightened up, passed the window and appellant stepped to the door and called to

her, but she kept going, climbed over the fire-wall, and he heard two shots in rapid succession. She was mumbling something; she "pulled the gun into full play"; he sat down and asked her to quit pointing the gun. She pointed the gun at herself and he started to run to get Miedema; then the gun went off. According to this statement this was the third shot. There was testimony from other sources that three shots were heard close together.

An examination of the gun revealed a finger print on the lower inside of the grip—probably, according to finger-print experts, Miss Bendowski's. No other finger prints were found. There is evidence of the finding of a towel in appellant's bathtub with smudge marks similar to marks that would be made by wiping off a gun like the one found by deceased's body. There is also evidence that it would have been difficult for deceased to have placed the finger-prints by holding the gun so as to shoot herself in the chest. There was no powder burn or mark on the coat or dress. In his statement to the officers appellant admitted that he had made previous false statements about the affair. There was other evidence, but it seems useless to go any further into detail.

With this recital it seems clear without discussion that as a matter of law and of fact the evidence is sufficient to sustain, first, the *corpus delicti,* and second, the verdict of the jury upon their implied finding that the deceased came to her death by the intentional infliction of a gun-shot wound upon her body by appellant. The latter con-tends against both of these conclusions.

It seems hardly necessary to mention that the *corpus delicti* need not be established by the degree of evidence necessary to convict before extrajudicial statements of the defendant may be introduced, or that this court cannot pass upon any implied finding of fact where there is any substantial evidence to support it.

In the consideration of the various points made by appellant, it is well to have in mind the rule that courts give weight to the fact that a motion for new trial has been argued and denied in the trial court before the judge who tried the case. (*People* v. *Ellis,* 188 Cal. 682 [206 Pac. 753].) "He (the trial judge), too, had to be satisfied that the evidence as a whole was sufficient to sustain the verdict;

if he was not, it was not only the proper exercise of a legal discretion, but his duty, to grant a new trial." (*People* v. *Lum Yit*, 83 Cal. 130 [23 Pac. 228].)

■ This disposes of points I and II and brings us to point III of appellant's opening brief. As related in the statement of facts, Miedema stopped to wipe the door lock with a handkerchief before he took hold of it to let Mrs. Smith out of the store after the shooting. The court asked the question: "Did you want to stop the finger prints on the lock; is that what you had in mind?" The witness answered in the affirmative. The question was objected to on practically all of the usual grounds of objection and a motion to strike the answer was made and denied. The question was assigned as prejudicial misconduct by appellant and the court was requested to admonish the jury to disregard it. This was not done. We agree with appellant that this (quoting from his brief) "tended in no way to prove or disprove any material issue in the case". We are unable to perceive how it could have been prejudicial to him in the slightest degree.

### Point IV.

■ In instructing the jury as to the law, the court gave an instruction defining murder of the first and second degree and manslaughter, with a description of how to distinguish them each from the other. We do not understand that there is any adverse criticism of the instruction itself. Appellant, however, complains that no instruction as to manslaughter should have been given. The jury was entitled to such instruction. ■ The court also gave an instruction in the words of section 1105 of the Penal Code, as follows: "Upon a trial for murder, the commission of the homicide being proved, the burden of proving circumstances of mitigation or that justify or excuse it devolves upon the defendant, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter or that the defendant was justifiable or excusable." This is particularly objected to because, according to appellant, it assumes that the commission of the homicide by the defendant has been proven in the case and because it does not specify the degree of proof required of the defendant to sustain the burden of mitigation or justification. We have examined the complete instructions as they were given, and if we assume that the

jury was made up of ordinarily intelligent people, which we do assume, the jury could not possibly have been misled into the mistaken idea that the court was assuming anything as to the issue of fact. We shall again refer to this point when we comment upon the cases cited by appellant as authority for this and at the same time as to other points.

Assuming, for the sake of argument only, that no mention of manslaughter should have been made in the instructions, and assuming, also for the same purpose, that the criticisms mentioned are well taken, how can appellant be heard to complain? It is true he has at all times denied that he had any hand in the death of Helen Bendowski. At no time has he suggested any mitigation, justification or excuse for anything. Appellant cannot, then, complain, as the crime of which he was convicted is the least in degree of the crime with which he was charged. (*People* v. *Miller,* 177 Cal. 404, 409 [170 Pac. 817] ; *People* v. *Wilt,* 173 Cal. 478 [160 Pac. 561] ; *People* v. *Tugwell,* 32 Cal. App. 520, at 530 [163 Pac. 508].) The jury in possession of all of the testimony found that the death was caused by appellant. If the testimony in the circumstances of this case supports that implied finding it would support the finding of murder. (An able discussion on the shifting of the burden in murder cases upon mitigating circumstances is contained in *People* v. *Jones,* 160 Cal. 358 [117 Pac. 176].) If the suggestion of manslaughter gave the jury the idea that possibly there were some mitigating circumstances in the killing, and in their private deliberations they concluded that appellant did the killing but that they would acquit him of murder and convict him of manslaughter, a crime included within the crime of murder (*People* v. *Muhlner,* 115 Cal. 304 [47 Pac. 128]), appellant has been the beneficiary of such suggestion. Without it, it may be assumed that the jury would have convicted him of murder. (*People* v. *Tugwell,. supra.*) This being true, he cannot be heard to object. (*People* v. *Muhlner, supra; People* v. *Cramley,* 23 Cal. App. 340 [138 Pac. 123]—a case not unlike the instant one, in principle. This case also distinguished *People* v. *Huntington,* 138 Cal. 261 [70 Pac. 284] ; *People* v. *Hamilton,* 49 Cal. App. 30 [192 Pac. 467] ; *People* v. *Borrego,* 7 Cal. App. 613 [95 Pac. 381].) The law is settled that the giving of an instruction inapplicable to the

cause on trial, while error, is not reversible error unless it has prejudiced the defendant. (*People* v. *Wilt, supra; People* v. *Grill,* 151 Cal. 592 [91 Pac. 515] ; *People* v. *Tapia,* 131 Cal. 647 [63 Pac. 1001, 1005] ; *People* v. *Miller, supra.*) It is our conclusion that appellant has suffered no prejudice by the court's instructions on manslaughter.

At the outset of appellant's treatment of his point IV in his opening brief he asserts as a fact that "there is little or no evidence tending to connect the defendant with the death of Helen Bendowski", and deducts from such assumed statement of fact that any slight error would have been sufficient to have caused a miscarriage of justice. We cannot accept the assumption in our consideration of appellant's points.

Two cases are stressed by appellant, *People* v. *Huntington* and *People* v. *Tapia, supra.* These two cases have been cited and analyzed many times by the appellate courts of this state. Suffice it here to say that the former was a murder case in which the defendant was charged with having caused the death of a young woman while he was unlawfully attempting an abortion. The court gave an instruction that would have been proper had defendant offered the suggestion that the death was caused while treating the patient (defendant was a physician) for a disease. The jury brought in a verdict of manslaughter. The Supreme Court said in its opinion reversing the judgment that this instruction injected an entirely new element into the case, one entirely foreign to the proof. In the Tapia case, also involving a murder, the evidence was so weak that the court felt that the slightest error might have been the deciding factor. The instructions as they reached the jury, either by inclusion or exclusion, left it at liberty to consider an extrajudicial statement, itself of doubtful authenticity, in determining the *corpus delicti.* The court also instructed the jury, as did the court in the instant case, by quoting section 1105 of the Penal Code, but went further and defined burden of proof. The judgment was reversed, the Supreme Court saying: "In conclusion, we desire to say that this decision is based upon the very peculiar features of this case as above shown, and that in many cases the errors above noticed would not call for a reversal."

The case of *People v. Grill, supra,* had exactly the same instruction that was given in the instant case, and it was there held that the instruction implied no assumption of guilt. It cites and distinguishes the Tapia case. The same point is treated in the same way in *People* v. *Wilt, supra,* at page 484.

Appellant also relies upon *People* v. *Kelley,* 24 Cal. App. 54 [140 Pac. 302]. This is another murder case, wherein the definitions of manslaughter were given. The jury returned a verdict of guilty of involuntary manslaughter. The case in principle has many elements not dissimilar to the instant case. The Court of Appeal reversed the judgment because there were no elements of involuntary manslaughter in it, but made the following significant statement: "Strictly speaking, there was but one or the other of two results which, under the evidence, could logically have been reached by the jury, and that was to convict the defendant of one or the other of the two degrees of murder or acquit him. This is not to say, however, that a verdict of voluntary manslaughter could not be sustained upon the record before us; for it is true, as a general proposition, which might, perhaps, be held applicable in this case had the defendant been convicted of voluntary manslaughter, that a party will not be heard in an objection to a verdict of manslaughter against him under an indictment for murder, where it appears that, under the evidence, he in justness ought to have been convicted of the crime of murder of one or the other of the degrees thereof, the theory of that proposition being that there can in reason be no just cause of complaint by the defendant where the verdict is more favorable to him than is perhaps justified by the evidence."

We shall consider appellant's points VI and VII together, as they both concern specifications of alleged misconduct of the deputy district attorney at the trial. ■ In the closing address to the jury the deputy district attorney made the following remarks: "We treasure the associations of our youth as the most precious possessions of a normal life, but this girl, debauched early by this man in her youth, domineered by him, taken to night-clubs by him, taken from her usual decent associations by him, she lost those connections and it is not to Wolcott's credit." These remarks were duly excepted to and the court was requested to in-

struct the jury to disregard them. This the court did not do. While the remarks might well have been omitted, a reading of the evidence reveals the fact that they were not far from accurate. It is unreasonable to believe that the remarks added anything to the sordid and tragic story that had been related to the jury through competent evidence.

In the deputy district attorney's opening address to the jury he stated that he would prove that appellant once knocked deceased down in a public drinking place entirely without provocation, and that in answer to a question as to why he had done such a thing, he replied, ''I just got tired of looking at the woman.'' It appears that in an attempt to prove this episode a witness testified that he saw appellant and deceased at a beer place, but answered in the negative as to the fact of the assault. The deputy district attorney stated that he was taken by surprise, but counsel for appellant stipulated that the statement had been made by the prosecutor in good faith and the episode ended. The statement made at the opening must have seemed mild to the jury when compared to what they listened to later in the course of the trial. No exception to this statement was made at the trial. (*People* v. *Cramley, supra.*) We think neither of these statements could have acted to the prejudice of appellant. ''Verdicts will not be disturbed merely on account of the inadvertent mistakes of counsel as to matters of evidence in addressing juries. It is only when from the course of conduct of a prosecuting officer it is apparent that the right of the defendant to a fair trial has been prejudicially invaded that he can successfully complain of it.'' (*People* v. *Willard*, 150 Cal. 543, 551 [89 Pac. 124, 128] ; *People* v. *Sing Low*, 145 Cal. 1, 9 [78 Pac. 235].)

Point VIII.

This assignment is that the following statement by the deputy district attorney in his opening address was prejudicial to appellant and was not substantiated by the evidence: ''We will satisfy you also that the fingerprints were removed from the gun, and even an attempt was made to place that gun in the hand of the dying girl, where the fingers were pressed against it in an attempt to have fingerprints found.'' We think a clear understanding of the facts as abbreviated in this opinion absolves the prosecutor of any attempt to deceive or to prejudice the defendant on

trial. It is true that no evidence was introduced upon the point that an attempt had been made to place the hand of deceased so that finger prints could be found. A finger print probably of the deceased was found upon the handle of the weapon, however, and it is clear that the deputy district attorney was deducing from that fact his idea of how it got there. But the instructions plainly informed the jury that they were to decide the case upon the evidence adduced before them, and the prosecutor himself stated to them as follows: "I want the jury to understand that no matter what form I couch the language, all I am doing here is outlining the evidence in this case. Do not consider what I say as evidence." Appellant suffered no prejudice in the circumstance.

Upon all of the points herein treated appellant based his motion for a new trial, and he bases his prayer for reversal in this court upon the proposition that a new trial should have been granted upon each and every assignment. He also bases his prayer for reversal here upon the proposition that each and every of his assignments shows that the judgment is against the law and the evidence in the case.

The judgment and order appealed from are affirmed.

Craig, J., and Hahn, J., *pro tem.*, concurred.