[Crim. No. 2428. Second Appellate District, Division One.—November 8, 1933.]

THE PEOPLE, Respondent, v. CARL E. VESTER, Appellant.

John S. Cooper and L. Clark Davies for Appellant.

U. S. Webb, Attorney-General, and William F. Cleary, Deputy Attorney-General, for Respondent.

HOUSER, J.—On the trial of an action on each of three counts contained in an information filed against him, defendant was found guilty of the crime of robbery. Later, on the trial of the issue of his sanity at the time when each of such crimes was committed, defendant was found to have been sane. Although somewhat defective in form, if not in substance, it is understood that the appeal presented by defendant is from each judgment that was rendered against him in response to the corresponding verdict that was returned by the jury.

Perhaps the principal issue that is raised by appellant has reference to the point that prejudicial error was committed by the trial court in its failure to determine judicially

whether defendant was sane at the time when the trial occurred.

By the express terms of section 1367 of the Penal Code, the lack of authority of a judicial tribunal to proceed with the trial of an insane person is clearly indicated by the provision that "a person cannot be tried . . . while he is insane". And in that connection, as far as concerns the point here under consideration, the pertinent portion of section 1368 of the Penal Code is that "if at any time during the pendency of an action, . . . a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be submitted to a jury; . . . "

The statutory inhibitions may thus be noted, first, that an insane defendant in a criminal action *cannot be tried;* and secondly, that if a *"doubt"* arises as to his sanity, the trial court is required to proceed to a test of the question of the sanity of the defendant. Manifestly, on the one hand, at least as far as the court is concerned, the ultimate fact of insanity of any person may be determined by a judicial proceeding only; on the other hand, when the question as to whether a statutory *"doubt"* regarding the sanity of a defendant has arisen, and regarding which in consequence of either an express or an implied affirmative finding thereon a hearing should result, constitutes the matter to be considered, the decision with reference thereto, although likewise to be reached by judicial inquiry and determination, nevertheless may be subject to uncertainty. But in any event, construing the express language employed in the statute, as well as that which may be therein implied, it would seem probable that the "doubt . . . as to the sanity of the defendant" must be one which "arises" in the mind of the trial judge, as distinguished from any uncertainty which may exist in the mind of any other person regarding such question. Neither statute, legal principle nor maxim of equity is suggested as a guide for the determination as to when, or under what circumstances, a "doubt" may be said to have legally arisen or to have been thus created. Whether its existence is legally required or demanded from a mere trifling remark or by a single apparent eccentricity of the defendant; or by opinions of his intimate acquaintances; or by alienists, based upon either few or many facts or abnormal conduct regarding the mental integrity and responsibility of the defendant; or even the required extent of the insanity; is nowhere

directly indicated in the law. In such circumstances, necessarily the determination by the trial judge of whether the statutory "doubt" has arisen constitutes a matter of ultimate fact, not necessarily to be arrived at by and in accordance with the fixed rules of evidence applicable to any other judicial proceeding, but rather, because of the intricacies, difficulties and peculiar circumstances which may be present, by any pertinent, substantial and reliable evidence, however introduced to the attention of the trial judge. Whatever may have been the inducing cause therefor, after a preliminary inquiry regarding the sanity of a defendant has been initiated, necessarily the ultimate and deciding question which confronts the trial judge for his determination must be either, has a "doubt" been created, or is the question of his insanity free from doubt? Nor may any positive indication be discovered in the language of the controlling statute, or in any related law, by which may be determined the question of the finality, or the conclusiveness, of the decision which may be reached by the trial judge. Whether his judgment in the premises is wholly discretionary; whether it must be reached in accordance with a preponderance of evidence; or, going beyond either of such requirements, by evidence which leaves no reasonable doubt as to its correctness;—no "guiding star", at least in this jurisdiction, either by statutory direction, or by judicial precedent, seems available. In such circumstances, general principles of law governing situations more or less analogous in their nature to the fact here under consideration must suffice.

At the outset, it may not be amiss to direct attention to the obvious fact that the question here at issue arises within a criminal action, and consequently that it directly involves a principle which, under varying circumstances, may affect the life or the liberty of an innocent person. With so much in mind, and in accordance with long-seasoned rules affecting the administration of justice in such matters, the conclusiveness of the implied decision of the trial judge as to whether a "doubt" had arisen respecting the sanity of the defendant, founded entirely upon his discretion, may be regarded as entirely inappropriate. In itself, unbridled legal discretion in reaching a decision may go so far as to contemplate or to embrace the disregard of apparently substantial, reliable and

uncontradicted facts and evidence, and in their place and stead the substitution of a legal presumption, or evidence which, generally speaking, may be regarded as flimsy, weak or correspondingly impotent. Ordinarily, the proper and legal protection of the rights of a defendant, presumably innocent of the crime of which he is charged, will not tolerate such a course. As it may affect personal privileges, favors or acts of grace which may be extended by a court to a person who already has been convicted of the commission of a criminal offense, it is readily perceivable how a legal discretion in a court may become an eminently proper, and conclusive element; but as a broad and unlimited discretion may affect positive and affirmative rights of persons who may be before the court merely accused of the commission of crimes, it is difficult, if possible, to admit its appropriate applicability; or, if attempted to be and actually exercised, to recognize its binding force, or its legal conclusiveness. Nor has the doctrine of preponderance of evidence any rightful place where the question of the guilt of a defendant is the issue. In such circumstances, a decision in that regard, if determined in the affirmative, must be reached by evidence which leaves no reasonable doubt as to the correctness of the conclusion. On the trial of a criminal action, viewed from the position of the prosecution, preponderance of evidence is entirely inappropriate as an expression relative to the burden of establishing any fact in the case. It is an undeviating rule that every material element constituting the offense charged must be established beyond a reasonable doubt. But in complete opposition thereto are the rules which affect rights, or so-called "defenses", interposed by the defendant. For their legal recognition, the defendant is not required to prove beyond a reasonable doubt either justification, excuse, or any other ultimate fact which properly may result in an acquittal. For example, when the defendant seeks to prove the so-called "defense" of alibi, the burden is not cast upon him to establish the ultimate fact beyond a reasonable doubt, or even by a preponderance of evidence. Rather, any evidence, however apparently weak, or contradictory in itself, is sufficient, provided that it create a reasonable doubt as to his guilt. Similarly in some respects is the "defense" of insanity. It is not offered, nor may it be considered either as justification or in mitigation of the offense of which the

defendant is charged. When established, it serves simply as an evasion of responsibility; in effect, confession and avoidance. But unlike the "defense" of alibi, as far as the *quantum* of evidence for its establishment is concerned, the "defense" of insanity of the defendant at the time when the alleged crime was committed requires for its proof not merely the creation in the minds of the jurors of a reasonable doubt regarding the guilt of the defendant, but demands that his insanity at the time in question be established by a preponderance of evidence. However, such rules have relation either to the trial of a criminal action; or, following a conviction of the defendant, to a hearing had for the express purpose of adjudicating the issue of his sanity, limited to the time when the offense was committed. And it may be assumed that on a trial instituted under the provisions of sections 1367 and 1368 of the Penal Code for the purpose of determining the then present sanity of the defendant, the burden of establishing the ultimate fact of his then insanity would rest upon him, and which latter fact could be properly determined only by a preponderance of evidence to that effect. But in the instant case, as hereinbefore has been indicated, a reference to such issues and to some of the rules by which they are governed, is material only as illustrative of the duty and the burden which is cast upon the respective parties in particular circumstances which may arise in the course of a criminal action; from which it is thought may be deduced the general rule that, as affects the maintenance by the defendant of positive rights afforded him, or to which he may be entitled, the most that may be required is that he establish such rights by a preponderance of evidence.

■ However, the question here under consideration does not concern the actual inquiry into the question of the sanity of the defendant; but simply involves the right to have such inquiry invoked or initiated. The language of the statute (sec. 1368, Pen. Code) is that "if at any time during the pendency of an action, . . . *a doubt arises* as to the sanity of the defendant, the court must order the question of his sanity to be submitted to a jury. . . . " Concretely, the pivotal issue is, how may it be determined that a "doubt" has arisen? If it be not a conclusion of fact that must be established beyond a reasonable doubt; or strictly, by a preponderance of evidence; nor one, the existence of which

depends upon a decision resting within the discretion of the trial court;—by what process or procedure may such a substantial right, so positive in its nature and so important in its possible consequences to the defendant, be secured to him? It is clear enough that, in the first instance, the trial judge must weigh the relevant, material facts which have been brought to his attention, and from a consideration of them decide whether a "doubt" has arisen. But manifestly his decision thereon cannot be conclusive and final. At least, if on appeal from a judgment of conviction, prejudicial error of the trial court in that regard be properly presented as a reason for reversal of the judgment, the application of no rule of law or of procedure is suggested as a preventive of its consideration. If, then, as a matter of law it appear that the facts were such that necessarily a "doubt" must or should have arisen (and not simply that as a privilege, or as a favor, such a conclusion might, or might not, have been accorded to defendant, dependent upon the discretion of the trial judge), it becomes clear that in the failure by the trial judge to decide that a "doubt" had arisen as to the sanity of defendant, and thereupon to order that "the question as to his sanity . . . be submitted to a jury", an omission by the trial court to exercise what may be termed a jurisdictional duty resulted, with the inevitable consequence that defendant was prejudiced in his substantial right in the premises.

It then becomes advisable to consider the facts. From the record herein it appears that, as early as March 17, 1933, at a time when defendant was arraigned to plead to the information by which he was charged with the commission of the several offenses of robbery, the following order was entered on the minutes of the trial court:

"It appearing to the Court that defendant Carl E. Vester *should be examined as to his mental condition,* it is ordered that he be transferred from the county jail to Ward 110 of the Los Angeles General Hospital for observation and examination *as to his mental condition.* It is further ordered that when said examination has been completed, said defendant shall be returned to the county jail and it is requested that a copy of the report be furnished to this court for its information and record."

Presumably in response to said order, defendant was "transferred from the county jail to Ward 110 of the Los Angeles General Hospital for observation and examination *as to his mental condition*". At any rate, under date of March 24, 1933, the following "report" regarding defendant was made to the trial judge by the superintendent of the General Hospital, to wit:

"1. We are today returning to the county jail the above named patient who was admitted to this hospital March 20, 1933, on your Court Order No. 51559.

"2. We herewith give you the following report: Findings by examining psychiatrist (Staff physician) 'this man seems confused, cannot carry on a very relevant and connected conversation. Is restless, cannot sleep well, says he has "shocks" or "explosions" in his chest. He is in a semi-dazed condition most of the time. Gives a history of syphilitic infection eight years ago and now has a positive (4 plus) Wasserman. Diagnosis: psychosis probably of syphilitic infection.' "

Under date of April 8, 1933, an additional "report" presented by Dr. Victor Parkin in apparent response to the order made by the trial court, read as follows:

"I herewith very respectfully submit my report of the examination I made of Carl E. Vester at the Los Angeles County Jail on April 4, 1933.

"Personal History: Mr. Vester is 28 years of age, married, has no children. Education—one year in high school. Occupation, sewing machine salesman.

"Medical History: The prisoner contracted syphilis nine years ago. He attempted suicide with poison while in Portland and was treated in the hospital. While there, it was ascertained that he had a four plus Wasserman of the blood. He has complained of headaches and dizzy spells for several years—worse at night.

"Mental Status: The subject is emotionally depressed, mentally confused; sustains a connected train of thought only with difficulty. He complains almost constantly that he is being neglected because he is not receiving treatments for syphilis, which every one knows that he has because he states he continually hears people talking about him. He is incompletely oriented—does not know the date of the week, but knows the year. His content of thought appears to be

largely delusional. He blames his father for his present predicament and says that his father has it in for him and prevents him from getting treatment. He is also suspicious of others, his wife in particular. At times he refuses to eat food prepared by his wife, saying: 'I don't trust her. I hid the oxalic acid in the house and wanted to be careful.' He also hid knives under the rug in their home. He is also apparently hallucinated, stating that he hears people talking about him and from time to time he hears his father's voice calling him. He says he has been unsuccessful in selling sewing machines because other sewing machine men talk about him. He also states he has not been selling any sewing machines because he cannot remember what to say like he used to.

"Physical Examination: The prisoner is somewhat undersized, undernourished individual with a muddy, pasty complexion. His deep reflexes are normal. The pupils are round, equal and react to light and accommodation; and no objective signs indicating involvement of the brain and central nervous system in a syphilitic infection were noted.

"Diagnosis: Insane."

And under date of April 20, 1933, Dr. Benjamin Blank, county jail physician, presented a third "report" as follows:

"As an appointee of the court, an examination of the above man was made to ascertain his mental condition, and submit the following:

"In my opinion this man is of unsound mind, does not know the difference between right and wrong, nor the nature and consequences of his acts. From observations and examinations of this man I find that he is confused, depressed, has persecutory delusions and visual hallucinations. He attempted to jump off the roof on one occasion; claims that there is someone watching him all the time.

"Physically, he has a long syphilitic history which undoubtedly has affected the central nervous system to some extent, and still has positive signs of the same at this time.

"I believe this man is suffering from dementia praecox and believe him to be insane at the time of the act for which he is now incarcerated."

All such "reports" were submitted to the trial judge before the trial of the action against defendant was commenced. During the trial, evidence was received relating to

the sanity of defendant at the time when each of the alleged offenses was committed. In addition to the testimony given by each of the two physicians who, as hereinbefore set forth, formerly had reported with reference to the then present sanity of defendant, the wife of defendant gave her testimony. Without going into details, it may suffice to state that, as to the testimony thus given by the two physicians, it was in harmony with the conclusions expressed by each of them in his "report" and was to the effect that not only was defendant insane at the time when the several offenses were committed, but as well that at the time when the action against defendant was being tried, he was insane. In substance, the wife of defendant gave similar testimony, which was supported by statements which related to specific abnormal acts of defendant.

Relative to that issue, at no time prior to that when the trial of defendant occurred was evidence of any facts, or of opinion by experts, contrary to those indicated in the "reports" to which attention has been directed herein, received by the trial court; and during that part of the trial of defendant which related to the question of whether he was insane at the time when the alleged offenses were committed, the only evidence received by the trial court which in any way militated against the statements or the testimony given by the two physicians and the wife of defendant was testimony given by a policeman to the effect that in a conversation had between him and defendant, the defendant made "sensible answers" to questions which the former propounded to the latter. The fact is thus placed beyond controversy that preceding the date of the trial of the action, through or by some means not disclosed by the record herein, it had appeared to, and had been decided by, the trial court "that the defendant Carl E. Vester should be examined *as to his mental condition*"; that thereupon and following the observation and examination of defendant, from at least three separate and distinct, reliable and trustworthy sources the trial court was advised that defendant was *insane*. It would seem incontrovertible, or at least so clear that thereby and therefrom a "doubt" had arisen regarding the sanity of defendant, that discussion of that point would be superfluous. The original order made by the trial court should be sufficient indication in itself that

some uncertainty existed. But when coupled with the mass of information subsequently received by the trial judge relative to the then "mental condition" of defendant, no room was left for the slightest uncertainty that a "doubt" had, or at least should have, arisen. Notwithstanding the existence of such "doubt", either in violation of, or through inadvertence to act in accord with, the statutory requirement, the trial court failed to "order the question as to his (defendant's) sanity to be submitted to a jury"; but permitted the trial of the action to proceed as though no such "doubt" had arisen.

Aside from the statutory provision to which reference has been had, by which the trial of an insane person for an alleged criminal offense is forbidden, the underlying principle, with the indicated reasons therefor, may be found in 4 Blackstone's Commentaries, page 24, as follows:

"The second case of a deficiency in will, which excuses from the guilt of crimes, arises also from a defective or vitiated understanding, viz. in an *idiot* or a *lunatic*. For the rule of law as to the latter, which may easily be adapted also to the former, is, that, *'furiosus furore solum punitur.'* In criminal cases therefore, idiots and lunatics are not chargeable for their own acts, if committed when under these incapacities: no, not even for treason itself. Also if a man in his sound memory commits a capital offense, and before arraignment for it, he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried: for how can he make his defense? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if, after judgment, he becomes of non-sane memory, execution shall be stayed: for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution."

And in volume 1, Chitty's Criminal Law (1819), page 619 [*761], the subject matter is thus treated:

"The other cause for which the judge is bound to grant a reprieve, is the insanity of the prisoner. It has from the earliest periods been a rule, that though a man be in the full possession of his senses when he commits a capital offense, if

he become *non compos* after it, he shall not be indicted; if, after indictment, he shall not be convicted; if, after conviction, he shall not receive judgment; if after judgment, he shall not be ordered for execution. And this opinion is confirmed by the fact that a statute was passed in the reign of Henry the Eighth, to allow of execution of persons convicted of high treason, though insane, which was always thought cruel and inhuman, and was repealed in the reign of Philip and Mary. The true reason of this lenity is not that a man who has become insane is not a fit object of example, though this might be urged in his favor; but that he is incapable of saying anything in bar of execution, or assigning any error in the judgment. The judge may, if he pleases, swear a jury to inquire *ex officio,* whether the prisoner is really insane or merely counterfeits, and, if they find the former, he is bound to reprieve him till the ensuing session. . . . ''

A situation analogous to that in the instant case is disclosed in the facts and the opinion reported in the case of *People* v. *Ah Ying,* 42 Cal. 18. That case also contains a decision to the effect that *no plea of present insanity is required.* In other words, that the rights of the defendant in the premises may neither be lost nor jeopardized by his failure to make a motion to or a request of the trial court that the question of his present sanity ''be submitted to a jury''. In the cited case, in part the court said:

'' . . . *There is no plea of present insanity required.* If at any time a doubt arose as to the sanity of the defendant, it was the duty of the court, of its own motion, to suspend the trial or further proceedings in the case, at whatever stage the doubt arose, until the question of sanity was determined. Common humanity requires that one should not be tried for his life while insane, and counsel for the defendant cannot waive such inquiry when the doubt exists.; nor can he, by interposing such a plea, compel the court to enter upon such inquiry where no ground for such doubt exists. The fact that evidence upon the subject was allowed to go to the jury, and that they were instructed to find a verdict that the defendant was then insane if they were satisfied from the evidence that he was so, implies a doubt on the part of the court as to his sanity.''

Likewise, in *People* v. *West,* 25 Cal. App. 369, 371, 372 [143 Pac. 793, 795]:

"It cannot be too strongly emphasized that the question presented to the court was different from that involved in the consideration whether the defendants were responsible for the alleged homicide. As to their responsibility for the crime charged the inquiry must be whether they knew the difference between right and wrong and could distinguish the quality and consequence of their act, but here the question was *whether they were mentally competent to make a rational defense. . . .*

"And finally, as to the showing required to make it the duty of the court to submit the question of sanity to a jury, there is no discretion left in the court when a doubt arises as to the sanity of the defendant. And ordinarily, at least, if there are statements under oath of a credible person or persons that the defendant is insane, a doubt is or should be raised as to the defendant's sanity and the question must be submitted to a jury. The only contingency is, Does a doubt arise? If information comes, through a proper source and through proper channels, that the defendant is insane, or if, through observation and personal inspection, the information is disclosed to the court, a jury must be impaneled to pass upon the mental condition of the accused. (*Marshall* v. *Territory,* 2 Okl. Cr. 136 [101 Pac. 139]; *People* v. *Ah Ying,* 42 Cal. 18; *Freeman* v. *People,* 4 Denio [N. Y.], 9 [47 Am. Dec. 216].)

"We do not mean to say that the weight of the evidence and the credibility of the witnesses are not within the peculiar province of the trial judge, but we think that the circumstances here were such that *it should be held as a matter of law that a doubt was or should have been created and that it was the court's duty to submit the question as provided in section 1368 of the Penal Code.*"

In the case of *Guagando* v. *State,* 41 Tex. 626, it was held (syllabus):

"When an affidavit is made by a respectable person that a defendant charged with crime has become insane, a jury should be impaneled to try the issue of insanity before proceeding with the cause, and this though the party making the affidavit is unknown to those in attendance on court.

"The question to be determined on a plea of insanity is, 'is the accused mentally competent to make a rational defense;' and the error in refusing to submit this issue on a

plea of insanity, supported by affidavits filed before trial, *is not cured by trying the issue of insanity after trial and conviction.*"

The question here at issue was also involved in the case of *State* v. *Reed,* 41 La. Ann. 581 [7 So. 132]. In rendering its opinion, in part the court said:

"We consider it very clear that the counsel for defendant had the right to raise the question of their client's present sanity, without special or formal plea, and to have evidence received on the point, and to have the issue determined in some proper way. . . . But, whatever be his discretion as to the mode of determination, he undoubtedly committed error in refusing to entertain the objection, or to hear evidence thereon, or to determine it in any way."

In the case of *State* v. *Peacock,* 50 N. J. L. 34 [11 Atl. 270, 271], it is said: "If the court either before or during the progress of such a trial, either from observation or upon the suggestion of counsel, have facts brought to its attention which raise a doubt of the condition of defendant's mind in this respect, the question should be settled before another step is taken."

Although in the abstract the law in general is recognized to be in accord with the deciding principle announced in the case entitled *In re Buchanan,* 129 Cal. 330 [61 Pac. 1120, 50 L. R. A. 378], to wit: that if on the trial of a person accused of the commission of a criminal offense it appear that he is capable of understanding the nature and the object of such proceeding, and is able to conduct his defense thereto in a rational manner, for the purpose of being tried he should be deemed sane, notwithstanding the fact that on some other subjects his mind is deranged or unsound,—it is the opinion of this court that such a rule is inapplicable to the situation presented by the facts in the instant case. From an examination of the several "reports" presented to the trial court, it will be noted that that of the superintendent of the General Hospital contained the statement that "this man seems confused, cannot carry on a very relevant and connected conversation; is restless, cannot sleep well; says he has 'shocks' or 'explosions' in his chest; he is in a semi-dazed condition most of the time; gives a history of syphilitic infection eight years ago and now has a positive (4 plus) Wasserman. Diagnosis: psychosis probably of

syphilitic infection.'' Also that included within Dr. Parkin's report was the following: ''The subject is emotionally depressed, mentally confused; sustains a connected train of thought only with difficulty. . . . He is incompletely oriented—does not know the date of the week, but knows the year. His content of thought appears to be largely delusional. . . . '' Furthermore, in Dr. Blank's report it is said: ''In my opinion this man is of unsound mind, does not know the difference between right and wrong, nor the nature and consequences of his acts. From observations and examinations of this man I find that he is confused, depressed, has persecutory delusions and visual hallucinations. . . . I believe this man is suffering from dementia praecox and believe him to be insane at the time of the act for which he is now incarcerated.'' Although generally speaking, and without application to a situation wherein the capacity of the accused to distinguish ''right from wrong'' in respect to the acts for the alleged commission of which he either is, or is about to be placed, on trial, is the point at issue (14 R. C. L. 599 et seq., and authorities there cited), as is stated in the case of *People* v. *Willard,* 150 Cal. 543, 554 [89 Pac. 124, 129], and as has been adopted in many different subsequent cases which have arisen and have been determined in this state, in order that insanity of a defendant in a criminal action may be available to him as a ''defense'' therein, ''it must appear that the defendant, when the act was committed, was so deranged and diseased mentally that he was not conscious of the wrongful nature of the act committed. If he has reasoning capacity sufficient to distinguish between right and wrong as to the particular act he is doing, knowledge and consciousness that what he is doing is wrong and criminal and will subject him to punishment, he must be held responsible for his conduct. Although he may be laboring under partial insanity,—as, for instance, suffering from some insane delusion or hallucination,—still if he understands the nature and character of his action and its consequences,—if he has knowledge that it is wrong and criminal, and that if he does the act he will do wrong, such partial insanity or the existence of such delusion or hallucination is not sufficient to relieve him from responsibility for his criminal acts.''

Clearly, the statutory provisions contained in sections 1367 and 1368 of the Penal Code, which relate to the insanity of a defendant in a criminal action, must be read and construed in the light of the general definition of insanity as applied to criminal acts, as expressed in the language that appears in the authority to which reference just has been had. And until in the mind of the trial judge "a doubt arises as to the sanity of the defendant" as thus generally limited and defined, no occasion is presented by reason of which "the court must order the question as to his (defendant's) sanity to be submitted to a jury".

But in the instant case, in view of the undisputed evidence presented to the trial court both preceding and during the trial of the action against defendant, it is the conclusion of this court that a "doubt" had (or at least should have) arisen as to his then present sanity, and that the substantial rights of defendant in the premises were prejudiced by the failure of the trial court to "order the question as to his (defendant's) sanity to be submitted to a jury".

It becomes unnecessary to consider other alleged errors suggested by appellant.

The judgments are, and each of them is, reversed. It is further ordered that the cause be, and it is, remanded to the superior court for a new trial thereof, subject to the statutory provisions of section 1367 et seq. (chap. 6, of title 10, of part 2) of the Penal Code, which relate to an "inquiry into the insanity of the defendant before trial, or after conviction". And it is further ordered that the oral motion made by appellant in this court that it make its order for an examination of appellant "to determine his present sanity", be, and the same is, denied.

Conrey, P. J., and York, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 8, 1933.

Seawell, J., Thompson, J., and Curtis, J., dissented.