CARTER, J.
Defendant, James Merkouris, was charged by information[1] with the murder of Despine Forbes, his former wife. He pleaded not guilty, and not guilty by reason of insanity.[2] The jury returned a verdict of first degree murder, without recommendation, based entirely upon circumstantial evidence. Defendant’s motion for a new trial was denied and judgment was thereafter pronounced and the death penalty imposed. The appeal is automatic. (Pen. Code, § 1239, subd. (b).)
Defendant and Despine were married in Michigan in 1944. They moved to Los Angeles where they separated in February, 1945. Defendant divorced Despine in Michigan in May, 1945. Despine was married to Robert Forbes in September, 1946, in Los Angeles. Robert, a former police officer, and Despine went into the ceramics business at 5956 West Boulevard in Los Angeles.
In the summer of 1948, Inspector Wood of the United States Post Office received a telephone call from a man who identified himself as Robert Forbes. Inspector Wood testified that the person identifying himself as Robert Forbes made a complaint involving a violation of postal regulations as a result of which he went to the ceramics shop and interviewed Robert Forbes. Forbes directed Inspector Wood to go to the home of Despine’s mother where he picked up three letters in envelopes. The envelopes were postmarked at Los Angeles and two of them were addressed to Mr. Forbes and one to Mrs. Forbes; the letters were signed “Jim Merkouris” or “Jim Merkery.” The letters accused Mrs. Forbes of being a sexual degenerate and told Mr. Forbes not to worry about *544 it because he would not be around long. As a result of the action taken, defendant was indicted in Michigan for sending obscene matter through the mails, pleaded guilty, was fined $150 and placed on probation for two years. After the statute of limitations had run in 1951, Inspector Wood destroyed the letters. Inspector Wood testified from his recollection of the matter.
Another officer testified that Forbes had told him he was trying to get a permit to carry a gun because Despine’s “ex-husband” had been telephoning them and writing letters and that he was afraid of the man.
In 1953, defendant and one Jerry Pappos ran a restaurant in Detroit, Michigan, for about three weeks. During that time, Mr. Pappos went to the restaurant one morning and found a box with two guns in the bottom of the cigarette case. One of the guns had a cylinder on it similar to that on a Colt .38, but they were bigger. When he asked defendant about the guns, defendant said they belonged to a friend of his. Mr. Pappos told the defendant to get rid of them and defendant said, “Soon I get the guy I get them out.” The guns disappeared shortly thereafter. When the business was broken up, Mr. Pappos bought defendant’s interest by buying defendant a car in his, Pappos’, name, and making the payments thereon. The car was a black 1953 Pontiac hard-top.
The record shows that defendant, using the name “Jerry Pappas, ’ ’ registered at a hotel in Los Angeles on September 3, 1954; that he was driving a black 1953 Pontiac with Michigan license plates. Defendant checked out of the hotel on September 8, 1954.
Customarily, Robert Forbes took Despine to the ceramics shop and then took their daughter to the home of Despine’s mother where she was cared for during the day. Almost every day, Robert would park his car on West Fifty-ninth Place, go down the alley and into the back of the ceramics shop. On the morning of September 20th, a witness testified that he saw Robert open a window of the ceramics shop at about 9 :10 or 9:15; at from 9:15 to 9 :20 on the same morning, Robert took the daughter to Despine’s mother’s home where he was given a bowl of mush to take to Despine. Sometime between 9 and 10, the morning of the 20th, Robert was seen to park his car on Fifty-ninth Place and go toward the back of it as if to go down the alley.
Mr. and Mrs. Miner operated a service station at 5924 *545 West Boulevard in Los Angeles and lived in a house on an adjoining lot. The service station was open from 6:30 a. m. until 7 p. m. every day except Sunday. On September 7, 1954, the Miners noticed a muddy Pontiac parked in the vicinity of a telephone pole on West Boulevard facing south in the direction of Fifty-ninth Place between 9 and 10 in the morning; a man was sitting behind the wheel in the car. On the same day, at about 4 or 4:30 p. m., the Miners noticed the same car parked in the same place with the same man behind the wheel. Mr. Miner was able to read the word “Michigan” on the license plate. On each of the days from September 7th through the 18th, with the exception of Sunday, the 12th, the Miners saw the same car, with what appeared to be the same man, parked either by the telephone pole on West Boulevard or on Fifty-ninth Place by the stop sign, headed east toward West Boulevard. The man’s head, when he was parked on West Boulevard, appeared to the Miners to be facing south on West Boulevard and at times he appeared to be looking at the service station. When the man was parked on Fifty-ninth Place west of West Boulevard, he appeared to Mrs. Miner to be looking in the direction of the service station or straight ahead. On September 14, 1951, Mr. Miner became suspicious and called the car to the attention of a sergeant of the Police Department. The sergeant, who was in sport clothes, off duty, and a customer of the Miners, drove around behind the suspect car and ascertained that the license plate read AA 6930 Michigan. He wrote the number on the back of an envelope and gave it to the Miners. The sergeant could not positively identify the defendant as the man he had seen in the car. At one time, Mrs. Miner saw the man out of the ear walking north toward a flower shop on the corner of Fifty-ninth Place. Mrs. Miner identified the defendant as the man in the car. The Miners were both familiar with the ceramics shop owned by the Forbeses and knew both Despine and Robert.
About 9 :15 a. m., September 20, 1954, Mr. Miner saw the same Pontiac, with the same man in it, going west on Fifty-ninth Place. After making the boulevard stop on West Boulevard, the car turned south and passed from his sight; within five minutes thereafter he saw the man who had been driving the Pontiac walking around the apartment house and then east on Fifty-ninth Place toward the alley. The man turned his head and he and Mr. Miner stared at each other; the man turned to his right at the alley and disappeared into *546 the alley. The man was identified by Mr. Miner as the defendant.
About 9:15 a. m., September 20, 1954, Mrs. Simons was hanging up clothes in an areaAvay between the ceramics shop and an apartment house when she saw a strange man enter the areaway from West Boulevard and go into the first entryway (Simons’ entry) in the building; she saw him lean out of the entryway and look toward her; when she started toward him he ran out of the west entrance the way he had come. Mrs. Simons identified defendant from a picture of him and said that she recognized the lower part of his face since the man she had seen in the areaway had his hat pulled down over his eyes. Sometime during the morning, she heard four thumping, thudding sounds coming from within the ceramics shop; the sounds were different from those she had previously heard coming from the shop..
Around 9:45 a. m., September 20, 1954, Paul Yonadi left his apartment at 3550 West Fifty-ninth Place and backed his ear out of the garage which was across the areaway from the rear of the ceramics shop into the alley. He got out of the car to close the garage door. At this time, he saw a man, whom he identified as the defendant, come out of the wooden gate at the rear of the ceramics shop. Mr. Yonadi and the man looked at each other; the man then walked southward down the alley without turning around.
At 11:25 a. m., September 20, 1954, a sheriff’s patrol officer noted in his daily log that he had seen a 1952 Pontiac coach with a Michigan license plate AA-69-30 standing without a driver, or occupant, about 250 yards from the beach area at Point Dume, which is about 12 miles from Santa Monica. The officer searched the car but found no registration or identification. He looked for someone having a possible connection with the ear but found no one. The driving time between the ceramics shop and Point Dume was approximately 49 minutes.
Between 11:15 and 11:30 a. m., September 20, 1954, a salesman who made regular calls at the ceramics shop with bread, found the front door of the shop open. He rang several times but no one answered. He opened the door leading from the display room to the room in back thereof and saw the body of Mr. Forbes lying on the floor. The police were called, and when they arrived to investigate they found the body of Mrs. Forbes in a room adjoining that in which Mr. Forbes’ body was found. Both Mr. and Mrs. Forbes *547 had been killed by shots fired at either extremely close range or by holding the gun in contact with the head. A woman’s purse was hanging on a clothes rack; it contained some cash, cheeks, and a money order. A telephone in the room was off the hook.
Sergeant Forbes of the Los Angeles Police Department was a brother of the deceased Forbes. He remembered that Despine’s former husband had been from Michigan and obtained pictures of him from Despine’s mother. These pictures were shown to the Miners, and to Mrs. Simons and Mr. Yonadi, who all identified the defendant as the man they had seen that day.
Forty-four latent fingerprint impressions were obtained from the ceramics shop, 19 of which were identifiable; none of them corresponded to defendant’s prints. A “Cat’s-Paw” rubber heel print was discovered by the rear gate to the alley. The evidence showed that the heel of defendant’s shoe could have made the print.
The evidence is confusing as to the type, or types, of guns used. Of the eight pieces of metal recovered from the ceramics shop, five appeared to be slugs or spent bullets; three appeared to be portions of bullets, one of lead and the other two of a brass or copper material. The ballistics expert was of the opinion that the eight slugs and fragments found in the ceramics shop as well as the one recovered from the body of Despine had all been fired from a .45 caliber Smith and Wesson gun. The expert witness was also of the opinion that the bullet recovered from the body of Robert was a .32 caliber bullet. The land area around Point Dume where the Pontiac car had been found parked on the morning of September 20th was carefully searched and experienced skin divers searched in the water and rocks but failed to recover any firearm, or guns.
On Wednesday, September 22, 1954, a farmer living in Penrose, Colorado, was driving east from his farm to Pueblo, Colorado, on Highway 50 at about 4 p. m. Highway 50 goes west from Pueblo, through Salt Lake City to San Francisco. About nine and a half miles west of Pueblo he saw a wrecked car off the right-hand side of the highway. The wrecked ear was a black 1953 Pontiac. A dusty, dirty man with his left arm covered with drying blood was there and was later identified as the defendant. The farmer, at defendant’s request, took defendant, his briefcase, a suitcase *548 and a small kit into Pueblo. The defendant asked to be let out at the bus depot to clean up before going to report the accident; defendant told the farmer that he was from Texas and had been on his way to Salt Lake when he had a flat tire; that he had turned to go back to Pueblo to have the tire fixed. An officer patroling the road later the same day found the wrecked car; in it he found a dictionary, a book entitled “Investigator’s Handbook” with certain underlined passages, and a third book. The car was impounded in Pueblo; no report was ever made of the accident. The record shows that it was possible for defendant to have been at Point Dume at the time noted and close to Pueblo on September 22d.
Defendant was arrested in Hot Springs, Arkansas, on September 25, 1954. The officer sent to extradite him said defendant said he had not been in Los Angeles for some seven or eight years. Defendant testified that he had arrived in Los Angeles on September 3, 1954; that he left after five or six days to go to Texas; that he arrived in Galveston, Texas, a day or so before September 19th; that he saw his father in Galveston; that on the 19th of September, he left Galveston for Houston, which he left on the 20th; that he arrived in Dallas on the 20th; that he left Dallas on the 20th after eating and getting gas for the Pontiac; that he went to Oklahoma City, leaving there on the 21st for Amarillo, Texas, on his way to Colorado ; that he left Amarillo between midnight and 3 in the morning on the 22d, headed for Colorado on the way to Salt Lake City; that he passed through Pueblo and headed west; that he had a flat tire about 10 miles outside Pueblo; that on the way back to Pueblo, he lost control of the car which overturned; that a farmer drove him into Pueblo where by telephone he notified the police of the accident. He testified that from the bus depot in Pueblo, he took a bus to Oklahoma City where he bought a ticket to Hot Springs, Arkansas, where he was arrested. Defendant denied telling the officer he had not been in Los Angeles for seven or eight years; and said that the guns* had been temporarily left by a customer and appeared to be .22 caliber target pistols.
Defendant’s Sanity at Time of Trial
Defendant contends that the court erred in proceeding to trial when, on the first day of trial, February 7, 1955, there *549 was presented to the court the uncontradicted affidavit of John Vernon Miller, M.D. (a duly licensed psychiatrist) in which it was concluded that “the subject is medically and legally insane at the time of [my] examination and at the time of commitment of the alleged act.” The report, which is lengthy, shows that defendant is an epileptic, subject to both grand and petit mal seizures; that in 1941 his release from confinement in an army jail had been recommended because it was felt he was “mentally incompetent.”
Section 1367 of the Penal Code provides: “A person cannot be tried, adjudged to punishment, or punished for a public offense, while he is insane.”
Section 1368 of the Penal Code provides: “If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded. ...”
The People argue that Dr. Miller’s affidavit was handed to the court “regarding the plea of not guilty by reason of insanity”; that such a plea was thereupon entered and three doctors appointed by the court to examine the defendant; that at no time did defendant’s counsel suggest that defendant was insane at the time of trial so as to bring into play the provisions of sections 1367 and 1368 of the Penal Code. It is argued by the People that defendant’s counsel did not intimate, by affidavit or otherwise, that defendant was uncooperative or that they were unable to obtain assistance or information from him in preparing his defense. Dr. Miller’s affidavit shows, however, that “he [defendant] felt his attorneys ‘were railroading me in’ and ‘trying to get my money’ ”; that “He [defendant] has been quite uncooperative with his attorneys and demanding; refusing to take advice, feeling that they should believe he is innocent, they should get angry at the people he is angry at, and that he is supreme in his knowledge.”
The reports of the three court-appointed doctors were received by the court approximately a week after the commencement of the trial. Two of these reports show that the doctors were of the opinion that defendant was sane at the time of trial as well as at the time the crime was committed; the third report was to the same effect, although stating that defendant showed some “paranoid ideation.”
*550 In People v. Perry, 14 Cal.2d 387, 399 [94 P.2d 559, 124 A.L.R 1123], we said: “Ordinarily, the question whether a ‘doubt’ has arisen as to the sanity of the defendant is for the determination of the judge of the trial court. (People v. Keyes, 178 Cal. 794, 802 [175 P. 6]; People v. Hettick, 126 Cal. 425, 428 [58 P. 918]; People v. Fountain, 170 Cal. 460, 467 [150 P. 341]; People v. West, 25 Cal.App. 369 [143 P. 793].) And it is only where, as a matter of law, a ‘doubt’ may be said to appear, or where there has been an abuse of the discretion that is vested in the trial judge, in the determination of the question, that the conclusion of the latter properly may be disturbed on appeal therefrom. (People v. Gilberg, 197 Cal. 306, 317 [240 P. 1000]; People v. Moriarity, 61 Cal.App. 223 [214 P. 485]; People v. Rosner, 78 Cal.App. 497 [248 P. 683]; People v. Kirby, 15 Cal.App. 264 [114 P. 794]; People v. Little, 68 Cal.App. 674 [230 P. 178]; People v. Hettick, 126 Cal. 425 [58 P. 918].)” (People v. Aparicio, 38 Cal.2d 565 [241 P.2d 221].) It was also said in the Perry case, supra, that if the person whose sanity is in question is capable of understanding the nature and object of the proceedings against him and can conduct his defense in a rational manner, he should be deemed sane for the purpose of being tried, though on some other subject his mind may be deranged or unsound.
The report of one of the court-appointed doctors shows that defendant resented the examinations; that he stated that he resented the plea of not guilty by reason of insanity; that he at all times claimed he was innocent of the crime with which he was charged; that he refused to answer numerous seemingly unrelated questions on the ground that his refusal was on “advice of counsel.”
Closely related to this problem is that which occurred after the jury had returned a verdict of first degree murder without recommendation:
“The Court: ... I understand there is a matter to be taken up out of the presence of the jury. Let the record show the district attorney, defense counsel and the defendant are present. Is there anything you gentlemen want to take up before we proceed?
“Mr. Solomon: I was going to make this statement, if the Court please, that the defense is prepared to go ahead with this plea of not guilty by reason of insanity. I understand, though, Mr. Merkouris feels differently about it.
“The Defendant: Yes, that is right.
*551 “The Court: Well, Mr. Merkouris, I think I should say this to you, that I know that in the early part of the case, before we ever started the trial, the plea of not guilty by reason of insanity was put in for you by your counsel. I think he did that as a measure of protection.
“The Defendant: It was put in, though-
“The Court: Let me finish, just a minute, please.
“I think he did that as a matter of protection, because if occasion would arise, that plea would have to be entered before the Court started its trial. I will say if I had been in his place I would have done exactly the same thing, and I’ve been practicing law a few years myself. He’s been practicing law a great many years. We had also the advantage of your other two attorneys.
“We have now got to the point where the next step in the trial would be the trial of that question of not guilty by reason of insanity. Now, you have indicated that you don’t want that trial.
“The Defendant: I don’t want what?
“The Court: You don’t want to be tried on this question of insanity.
“The Defendant: Yes, that is correct.
“The Court: Do you want to withdraw your plea of not guilty?
“The Defendant: The plea was entered over my objection.
“The Court: I understand.
“The Defendant : As I explained to these men, it carried an implication of guilty, and that was one of the main reasons why these people convicted me. Well, that’s beside the point now. I understand that; in any event I want the plea withdrawn right now, because as far as I can see it’s useless.
“The Court: I want you to thoroughly understand the effect of this situation. I’m not going to talk about your case, I’m going to talk about cases in which both pleas are entered. If a defendant is tried for an offense and found guilty, and also has the plea of not guilty by reason of insanity, we next try in regular order the question as to that plea of insanity, is the man legally insane or is he legally sane ?
1 ‘ The Defendant : I understand that.
“The Court: If the jury found him legally sane, then the other verdict of guilty stands; if he is legally insane that operates as an acquittal. Now, that is an opportunity *552 you have under the plea of not guilty by reason of insanity.
“The Defendant: Well, no, to me that still carries an implication of guilty, and I see no reason why I should give such an implication. As I said before, I did not commit these crimes and I don’t care for that implication to go into the record. If those people want to convict me of crimes I did not commit, that’s their business, I understand that.
“The Coubt: You understand also-
‘ ‘ The Defendant : I understand what you mean.
“The Coubt : Your lawyers advised you to stand on your plea and to go trial.
“The Defendant: You’re looking at it from a lawyer’s viewpoint, but the jury is not.
“The Coubt: Well, of course, we can’t view it also from the defendant’s viewpoint, he’s sitting in a different seat looking at it.
“The Defendant: I want it withdrawn.
“The Coubt: You definitely do not want to try this question of insanity.
“The Defendant: No.
“The Coubt: You want to withdraw the plea? You understand if you do withdraw it, you stand convicted of first degree murder with the death penalty?
“The Dependant: I understand.
“The Coubt: The only possibility you’ve got is the chance something will be accomplished ?
“The Defendant : Yes, I understand.
£ 1 The Coubt : Let the record show the plea of not guilty by reason of insanity has been withdrawn.”
It is contended by the defense that the trial court committed prejudicial error in permitting defendant himself to withdraw the plea of not guilty by reason of insanity when he was represented by counsel and when the defendant’s sanity was the very issue involved.
Prior to the commencement of the trial itself, the court had before it an affidavit of a qualified psychiatrist in which it was averred, without any equivocation, that the defendant was medically and legally insane at the time of trial, as well as at the time the alleged act was committed. The Penal Code provides (§ 1368) that “If at any time during the pendency of an action ... a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded. ...” *553 It appears that a doubt as to the defendant’s sanity did arise in the mind of the trial court after he had read the report of Dr. Miller who was on the court list of psychiatrists. The record shows that the court, after reading the affidavit, and after being told that the defendant did not want a plea of not guilty by reason of insanity entered, said: “I think, under these circumstances, the Court would be compelled to accept a plea of not guilty by reason of insanity.” (Emphasis added.) At the same time, the court appointed three other psychiatrists to examine the defendant. It appears as a matter of law that there was, at that time, a doubt in the mind of the court as to defendant’s sanity. (People v. Ah Ying, 42 Cal. 18, 21.) We said in People v. Aparicio, 38 Cal.2d 565, 568 [241 P.2d 221], that “when a doubt of the defendant’s sanity . . . appears on the face of the record as a matter of law, an abuse of discretion is shown and the failure to order a determination of the question of sanity results in a miscarriage of justice and a reversal is required. (People v. Vester, 135 Cal.App. 223 [26 P.2d 685]; People v. West, supra, 25 Cal.App. 369 [143 P. 793].)”
Taking the evidence concerning defendant’s sanity as reflected in the record, we see that three court-appointed psychiatrists considered him sane at the time of trial as well as sane at the time the crime was committed ,• we see that one independent psychiatrist considered him both legally and medically insane at both times. This conflict in the medical evidence was sufficient to make the question one of fact which should have been tried. The colloquy between the court and the defendant relative to a withdrawal of the plea of not guilty by reason of insanity shows that the defendant did not understand the gravity of his predicament. (People v. Jensen, 43 Cal.2d 572, 576 [275 P.2d 25]; People v. Gomez, 41 Cal.2d 150, 158 [258 P.2d 825]; People v. Aparicio, 38 Cal.2d 565, 576 [241 P.2d 221].) He did not want, so he said, for the jury to have before it the “implication of guilt.” It should be remembered that this desire of defendant's was expressed after the jury had found him guilty of murder in the first degree without recommendation.
It is our conclusion that the trial court abused its discretion in not trying the issue of defendant’s sanity at the commencement of the trial and in permitting the defendant, over the implied objection of his counsel, to withdraw his plea of not guilty by reason of insanity. The People’s argument that defense counsel did not offer Dr. Miller’s affi *554 davit at the commencement of the trial so as to obtain a trial on that issue prior to the commencement of the trial, is immaterial. The section specifically provides that if a doubt arises as to the defendant’s sanity, the court “must order the question” to be tried. It is the duty of the court to order an inquisition, upon its own motion, if at any time a doubt arises as to a defendant's present sanity. We said in People v. Aparicio, 38 Cal.2d 565, 568 [241 P.2d 221], that “The failure of the defendant ... to plead that he was then insane within the meaning of the section is not controlling. The duty imposed upon the trial judge by the statute is not conditioned on a motion in reliance on the code provision. ’ ’ (People v. Ah Ying, 42 Cal. 18, 21; People v. Vester, 135 Cal.App. 223, 237 [26 P.2d 685]; People v. Sloper, 198 Cal. 601, 606 [246 P. 802].) In People v. Vester, 135 Cal.App. 223, 228 [26 P.2d 685], it was said: “If, then, as a matter of law it appear that the facts were such that necessarily a ‘doubt’ must or should have arisen (and not simply that as a privilege, or as a favor, such a conclusion might, or might not, have been accorded to defendant, dependent upon the discretion of the trial judge), it becomes clear that in the failure by the trial judge to decide that a ‘doubt’ had arisen as to the sanity of defendant, and thereupon to order that ‘the question as to his sanity ... be submitted to a jury,’ an omission by the trial court to exercise what may be termed a jurisdictional duty resulted, with the inevitable consequence that defendant was prejudiced in his substantial right in the premises.”
Defendant was represented by counsel and “It is settled that the attorney of record has the exclusive right to appear in court for his client and to control the court proceedings, so that neither the party himself (Anglo California Trust Co. v. Kelly, 95 Cal.App. 390 [272 P. 1080]; Boca etc. R. R. Co. v. Superior Court, 150 Cal. 153 [88 P. 715]; Electric Utilities Co. v. Smallpage, 137 Cal.App. 642, 643 [31 P.2d 412]; Toy v. Haskell, 128 Cal. 558 [61 P. 89, 79 Am.St.Rep. 70]; Crescent Canal Co. v. Montgomery, 124 Cal. 134 [56 P. 797]; Wylie v. Sierra Gold Co., 120 Cal. 485 [52 P. 809]; Mott v. Foster, 45 Cal. 72; Board of Commissioners v. Younger, 29 Cal. 147 [87 Am.Dec. 164]), nor another attorney (Johnston v. City of San Fernando, 35 Cal.App.2d 244, 247 [95 P.2d 147]; Drummond v. West, 212 Cal. 766, 769 [300 P. 823]; McMahon v. Thomas, 114 Cal. 588 [46 P. 732]; Prescott v. Salthouse, 53 Cal. 221; Hobbs v. Duff, *555 43 Cal. 485 [3 Cal.Jur. 637]), can be recognized by the court in the conduct or disposition of the case. (Board of Commissioners v. Younger, supra; Crescent Canal Co. v. Montgomery, supra.)” (Emphasis added; Wells Fargo & Co. v. City & County of San Francisco, 25 Cal.2d 37, 42, 43 [152 P.2d 625]; Zurich Gen. Acc. & Liab. Ins. Co., Ltd. v. Kinsler, 12 Cal.2d 98, 105, 106 [81 P.2d 913].) Considering the fact that defense counsel desired to proceed with the trial on the plea of not guilty by reason of insanity and the further fact that a doubt existed as to defendant’s sanity, it appears that the trial court clearly abused its discretion in permitting defendant personally to withdraw his plea of not guilty by reason of insanity.
Information
Defendant contends that the trial court committed prejudicial misconduct in permitting the admission of evidence relative to the death of Robert Forbes when the district attorney had elected to proceed solely on the information charging him with the murder of Despine Forbes. It is contended that the admission of this evidence was so prejudicial as to deprive him of due process of law within the meaning of both the federal and California Constitutions.
It appears that here the evidence complained of showed more than merely criminal disposition and was properly admitted as part of the res gestae, or because it helped to disclose motive, intent, or a common plan or scheme. The victims met their deaths in the same manner and, from all that appears, at approximately the same time. The jury was properly instructed concerning the limited purpose for which such evidence was received.
Alleged Prejudicial Misconduct of Trial Court
It is contended that the trial court was guilty of prejudicial misconduct in informing defendant that if he made another outburst, he would be gagged.
After the autopsy surgeon had testified concerning his examination of the body of Robert Forbes, the following occurred ;
“Q. All right, now, you go ahead and illustrate what you have just testified about concerning that first wound.
“The Court: (To defense counsel) Not quite so loud, gentlemen, I can hear what you say up here.
“The Defendant: Wait! I would like to make a remark at this time.
*556 “The Court: (To the defendant) Yon sit down.
“The Dependant: I’m being tried on one count. You are highly prejudicial, in my opinion.
“The Court: I don’t care anything about your opinion.
“The Defendant: You are conducting this trial in a partial manner, in a prejudicial manner. You are trying me here for one count. You are showing pictures of two people who were killed.
“The Court: I’m running this trial.
“The Defendant: You are running this trial in a very prejudicial manner.
“The Court: You may proceed, Mr. Leavy.
“The Defendant: You stupid old fool!
“The Witness : Wound Number 1-
“Mr. Leavy: Doctor, I don’t mean to interrupt you when you point out this-
“The Defendant: You may have written a few books on law, but you haven’t learned anything. You not only have a bungling police department-
11 The Court : That’s enough. I want to inform counsel-
“The Defendant:-but an unscrupulous prosecutor.
‘ ‘ The Court : According to People versus Harris, I have a right to order this man to be gagged so that he can’t make any noise, and I shall do so if we have any further disturbance along this line. ’ ’
In People v. Harris, 45 Cal.App. 547, 552-553 [188 P. 65], a similar occurrence took place and the court threatened in the presence of the jury to gag the defendant. It was there said: “It was the right of the defendant to be present at his trial and this right, notwithstanding his obstreperous conduct, was accorded him. It is the duty of a judge in the administration of justice to preserve the order of the court and to see to it that all persons whomsoever, including the defendant himself, indulge in no act or conduct calculated to obstruct the administration of justice. ’ ’ In People v. Loomis, 27 Cal.App.2d 236, 239 [80 P.2d 1012], the defendant, because of his loud and tumultuous conduct during the trial, was strapped to a chair and gagged. It was there held that “There can be no doubt as to the right of the court to use reasonable restraint in order to conduct the trial in an orderly and dignified manner.” In view of the defendant’s conduct, no prejudicial misconduct on the part of the trial court appears.
*557 Hearsay Evidence
It is first contended that the court erred in admitting evidence concerning the letters written by defendant to the two victims. It will be recalled that the letters themselves had been destroyed by Inspector Wood and that he was permitted to testify concerning his recollection of their contents. It will also be recalled that the letter to Robert Forbes told him not to worry about his wife’s alleged sexual degeneracy because he would not be around long. It is argued by defendant that the threat, if any, was against Robert, and not Despine with whose murder he is charged. In this connection it is also argued that the evidence concerning the letters is so remote as to be immaterial and irrelevant. In answer to the first argument, in People v. Wilt, 173 Cal. 477, 482-483 [160 P. 561], it was said (quoting from People v. Bezy), 67 Cal. 223 [7 P. 643]): “‘While threats against the deceased are admissible in evidence to show malice, threats against another person are only admitted under circumstances which show some connection with the injury inflicted on the deceased.’ (The italics are ours.) Where a sufficient connection is shown such threats are clearly admissible.” The evidence here showed that both persons had been killed in the same manner and, presumably, at approximately the same time. The letter to Despine which accused her of being a sexual degenerate could certainly be considered a malicious letter and the one to Robert a threat because of his marriage to Despine. (People v. Hong Ah Duck, 61 Cal. 387, 390; People v. Chaves, 122 Cal. 134, 143 [54 P. 596]; People v. De Moss, 4 Cal.2d 469, 474 [50 P.2d 1031].)
The court did not err in admitting secondary evidence of the contents of the letters inasmuch as proof of the destruction thereof was first made by Inspector Wood who later testified as to the contents of the letters. Section 1855 of the Code of Civil Procedure provides that “There can be no evidence of the contents of a writing, other than the writing itself, except in the following cases:
“1. When the original has been lost or destroyed; in which case proof of the loss or destruction must first be made. ...” The same section also provides that when a writing has been lost or destroyed, either a copy thereof or oral evidence as to the contents may be admitted. (People v. Guasti, 110 Cal.App.2d 456, 462, 463 [243 P.2d 59]; Deacon v. Bryans, 88 Cal.App. 322, 324 [263 P. 371].)
*558 Defendant’s argument concerning the remoteness in point of time of the letters and the deaths of the Forbeses goes to the weight of the evidence rather than its admissibility. (People v. De Moss, 4 Cal.2d 469, 474 [50 P.2d 1031]; People v. Brown, 76 Cal. 573, 574 [18 P. 678].)
It is next contended that the trial court erred in admitting in evidence copies of certain recordings. The police officer who went to Arkansas after defendant made, while there, certain recordings of his first conversation with defendant. When the officer returned to Los Angeles, he made a copy thereof on another type of machine. At the trial, defense counsel did not object to the use of the copy which was played because its sound facilities were better. In addition, the original recording was also played.
Evidence was admitted to show the copy was a true and correct one and defendant was advised by the trial court prior to the playing of the copy of the recording that it was secondary evidence. Both the original recording and the copy thereof were admitted in evidence without objection, and the original, as well as the copy, was played to the jury. Under the circumstances here present, defendant cannot now complain that a copy of the original recording was played to the jury. (People v. Porter, 105 Cal.App.2d 324, 331 [233 P.2d 102]; People v. Wignall, 125 Cal.App. 465, 474 [13 P.2d 995]; People v. Sellas, 114 Cal.App. 367, 378 [300 P. 150].)
Defendant also complains that certain notes and a written transcription of the tape recording used by the officer were erroneously admitted in evidence over objection. The record shows that the notes were used pursuant to section 2047 of the Code of Civil Procedure.* The record shows that the questioned writings were marked for identification ; that the court informed all attorneys they might see and use them, to which defense counsel replied, “Thank you very much.”
*559 Instruction On Lying In Wait
Defendant contends that the court committed prejudicial error in giving the jury an instruction on lying in wait. Section 189 of the Penal Code provides that all murder perpetrated by lying in wait is murder of the first degree.
The evidence on which this instruction was based has been heretofore set forth. It will be recalled that defendant was identified as the man who had been seen sitting in a car, also identified as his, between 9 and 10 in the mornings and 4 and 4:30 in the afternoons of September 7th through the 18th (with the exception of Sunday, the 12th), and that the ear was so parked that its occupant could see the ceramics shop where the crime later occurred. It will also be recalled that although defendant was seen in the vicinity of the ceramics shop on the morning in question, he was not seen parked on the street as before.
This court has said that in order to constitute lying in wait the elements of waiting, watching and concealment must be present (People v. Sutic, 41 Cal.2d 483, 492 [261 P.2d 241]; People v. Byrd, 42 Cal.2d 200, 209 [266 P.2d 505]; People v. Tuthill, 31 Cal.2d 92, 101 [187 P.2d 16]). We have here the elements of waiting and watching, but the record is devoid of any evidence tending to show that the defendant made any attempt to conceal himself or to keep his presence in the vicinity of the shop a secret. In the Sutic case, it was held that “concealment in ambush” was not necessary and that the evidence there fully justified the jury’s finding “that the homicide was the result of defendant’s intent to kill and was accomplished by his ‘lying in wait’ until the opportune time to strike. ...” (41 Cal.2d 483, 492, 493.) In the Tuthill case, it was held that the lying in wait was the “ ‘means’ through which defendant accomplished his purpose.” (31 Cal.2d 92, 101.) In the Byrd case, the evidence showed that defendant waited outside his wife’s house armed with a gun and that the murder occurred that night (42 Cal.2d 200, 209). In these three eases the killings occurred shortly after the “lying in wait,” and lying in wait was the “means” through which each defendant accomplished the homicide. In the present ease, the killings occurred on the morning of the 20th; the last time defendant had been seen parked in his car in the vicinity was on the 18th; he was not seen watching or waiting on the morning of the 20th, although he was seen driving his car in that vicinity *560 at that time. The facts in the case under consideration do not appear to us to justify a lying in wait instruction. The killings were not accomplished through defendant’s watchful waiting in his car; there was no attempt at either concealment or secrecy; and the killings did not follow on the heels of the watchful waiting.
If, as we have concluded, the evidence is not sufficient to justify the lying in wait instruction, there can he no doubt that the defendant was seriously prejudiced thereby since if the killing was committed by lying in wait, it was murder of the first degree by force of the statute (Pen. Code, § 189) and the question of premeditation was not further involved (People v. Byrd, 42 Cal.2d 200, 209 [266 P.2d 505]; People v. Tuthill, 31 Cal.2d 92, 99 [187 P.2d 16]).
Two Reasonable Theories Instruction
It is next contended that the trial court erred in refusing to instruct the jury concerning its duty if the evidence was susceptible of two reasonable theories.
Defendant offered this instruction: “If the evidence in this case is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant’s innocence, and reject that which points to his guilt.
“You will notice that this rule applies only when both of the two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of the possible conclusions should appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable, bearing in mind, however, that even if the reasonable deduction points to defendant’s guilt, the entire proof must carry the convincing force required by law to support a verdict of guilty beyond a reasonable doubt.”
The court instructed the jury as follows: “A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal, but the effect of this presumption is only to place upon the State the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to *561 some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that conviction that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.”
“Two classes of evidence are recognized and admitted in courts of justice, upon either or both of which, juries lawfully may base their findings, whether favorable to the People or to the defendant, provided, however, that to support a verdict of guilt, the evidence, whether of one kind or the other, or a combination of both, must carry the convincing quality required by law, as stated in my instructions.
‘ ‘ One type of evidence is known as direct and the other as circumstantial. The law makes no distinction between the two classes as to the degree of proof required for conviction or as to their effectiveness in defendant’s favor, but respects each for such convincing force as it may carry and accepts each as a reasonable method of proof.
“Direct evidence of a person’s conduct at any time in question consists of the testimony of every witness who, with any of his own physical senses, perceived such conduct or any part thereof, and which testimony describes or relates what thus was perceived. All other evidence admitted in the trial is circumstantial in relation to such conduct, and, in so far as it shows any act, statement or other conduct, or any circumstance or fact tending to prove, by reasonable inference the innocence or guilt of the defendant, it may be considered by you in arriving at a verdict.”
“I instruct you further that you are not permitted, on circumstantial evidence alone, to find the defendant guilty of the crime charged against him unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime, but are irreconcilable with any other rational conclusion.” (Emphasis added.)
In People v. Bender, 27 Cal.2d 164, 175, 177 [163 P.2d 8] (relied upon by defendant) we said in holding that the trial court should give an instruction of its own motion embodying the principle “ ‘that, to justify a conviction, the facts or circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion.’” (8 Cal.Jur. 371, § 405.) We also said there that the jury had been told that “ ‘If the evidence in this case is susceptible of two constructions or interpreta *562 tions, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant’s innocence, and reject that which points to his guilt.’ This instruction is eminently proper as far as it goes. To it should have been added a direct statement of the precise principle under discussion.” (Emphasis added.) It will be noted that in the case under consideration, the “precise principle” was given to the jury, but the instruction which was given in the Bender case was here omitted. In the Bender case, we held that under the facts there presented, the failure to instruct fully was not ground for reversal.
The evidence here is entirely circumstantial. No murder weapon (or weapons) were ever found; no fingerprints matching those of defendant were found in the ceramics shop. The most incriminating evidence against defendant is that he was identified as the man coming out of the back gate of the ceramics shop. Defendant’s theory was that he was not guilty; that he was not in Los Angeles on the 20th, although he admitted having been there on the 3d through the 8th or 9th of September when he left for Texas. From the résumé of the evidence heretofore set forth, it appears that at the time the case was submitted to the jury reasonable inferences of either guilt or innocence could have been drawn therefrom. The jury could have disbelieved the identification testimony of Mr. Yonadi who said it was the defendant he saw coming out of the back gate; it could have disbelieved the testimony of Mrs. Simons who said that the defendant was the man she had seen in the areaway because she recognized “the lower part of his face” from a colored picture. Under the circumstances here presented, that part of defendant’s instruction bearing upon two reasonable interpretations, or constructions, of the evidence should have been given.
Defendant’s offered instruction was refused because the trial court felt that it was not good law in that it “virtually says that when the evidence is equally balanced the defendant is entitled to a verdict of acquittal” and because it was in conflict with the reasonable doubt instruction. In a criminal case the prosecution must prove the defendant guilty beyond a reasonable doubt. Therefore, if the evidence is equally balanced, the defendant is entitled to an acquittal. Further, there is in the proposed instruction nothing inconsistent with the instruction on reasonable doubt. The offered *563 instruction was a correct statement of the applicable law and should have been given.
The judgment and the order denying the motion for a new trial are reversed.
Traynor, J., Schauer, J., and McComb, J., concurred.

 Defendant was charged in another information with the murder of Robert Forbes, husband of Despine. The district attorney elected to go to trial only on the information charging the murder of Despine.

Defendant, after the verdict was returned, requested permission to withdraw this plea.
Both of these points are now urged as reasons why this court should reverse the judgment and will be hereinafter discussed.

 Heretofore mentioned in Mr. Pappos ’ testimony.

 “A witness is allowed to refresh Ms memory respecting a fact, by anything written by himself, or under his direction, at the time when the fact occurred, or immediately thereafter, or at any other time when the fact was fresh in Ms memory, and he knew that the same was correctly stated in the writing. But in such case the writing must be produced, and may be seen by the adverse party, who may, if he choose, cross-examine the witness upon it, and may read it to the jury. So, also, a witness may testify from such a writing, though he retain no recollection of the particular facts, but such evidence must be received with caution. ’ ’